Minnie E. Hapke, Administratrix, Appellant, v. Ward T. Huston, Appellee.

Gen. No. 9,375.

Opinion filed June 28, 1939.

VERNON J. KNOX, of Crystal Lake, for appellant.

DAVID R. JOSLYN, of Woodstock, for appellee.

MR. JUSTICE HUFFMAN delivered the opinion of the court.

This is a suit brought by appellant as administratrix of her deceased husband's estate, to recover damages for his alleged wrongful death. Appellee owned a dairy farm in McHenry county. The deceased was living upon this farm under written lease, which in general provided that appellee lessor, and deceased, were to divide the profits from the farm and the increase in livestock, equally.

The lessee, Mr. Hapke, was injured by a bull on the premises on September 20, 1936, from which injuries he died. This suit was brought by appellant as administratrix to recover damages on behalf of herself (as surviving widow), and children for his alleged wrongful death. It resulted in a verdict for appellant in the sum of $5,000. Motion of the defendant for judgment notwithstanding the verdict was granted and judgment entered for defendant *non obstante veredicto*. Appellant has prosecuted this appeal from such judgment.

The material facts in this case are not in dispute. Appellee was a resident of Evanston in Cook county. The farm was operated as a dairy farm. The deceased lived upon the farm, together with his family, and operated it as tenant for appellee, from the latter part of 1933 until his death in September, 1936. The bull, used upon the farm when the deceased became tenant in 1933, was sold in the early part of 1935, and the bull which injured the deceased was purchased on February 19, 1935. It appears the deceased from time to time, sold such cows as he did not think were profitable to the dairy business, and that he exercised his own judgment as to the cows so sold and the price therefor. Appellee does not appear to have known anything about the operation of the dairy farm nor to have given it any of his attention. His business agent and farm manager was one Kenneth C. Brown. Mr. Brown went with the deceased at the time the bull in question was purchased in February, 1935. The bull was taken to

the dairy farm at the time of its purchase. The bull appears to have given no trouble nor manifested any bad temper until the spring of 1936. Up until that time, the deceased's son had been handling the bull, but he states that in the spring of 1936, the bull became ugly and hard to handle and that his father took charge of it and from that time on handled it himself. It further appears that during the summer of 1936, the administratrix and her husband spoke to Mr. Brown, the farm manager, about the ugly temper of the bull. Following this, the farm manager and Mr. Hapke went together to a stock man and bought a younger bull. This was in the month of July, 1936. The new bull was brought to the farm. Mr. Brown states he said to the deceased that since they had the new bull, no doubt he would sell the old one, to which the deceased replied that he had decided to keep them both for a while; that he wanted to turn the young bull out with the young heifers and keep the old bull in the barn for the larger cows. Mr. Brown says he suggested to the deceased that if he was going to keep the old bull, he should keep him locked up and watch him carefully, to which the deceased replied that he would.

The evidence shows that the deceased did look after the bull in question and kept him safely locked and tied in the barn, except when he released him for service, and that at all times when he was handling this bull, he used a pitchfork to make him behave, as well as having a ring in his nose to which a rope was attached. On the morning in question, the deceased had gone into the barn and released the bull and turned him out into the cowyard, whereupon the deceased turned his back toward the bull to close the barn door, at which time the bull struck him from behind, producing the injuries from which he died. The deceased's son and appellant were at the barn when the accident happened. The son ran to his father's aid with a pitchfork, whereupon the bull ran away.

Appellee and his farm manager Brown, were called as witnesses by the plaintiff. Appellee stated that he did not look after the farm and that Mr. Brown attended to all such matters and had the authority so to do. Appellee had owned the farm about 10 years. He did not know what breed the bull was and says he never saw it but once or twice. He stated' that Mr. Brown, who also lived in Evanston, visited the dairy farm on the average of once a week, and represented him and was authorized to act for him. Appellee says there had been different bulls on the farm, and that he knew about the purchase of the new bull some five or six weeks before the accident to Hapke. Brown was the only witness called on behalf of the defendant. His testimony is about the same matters as testified to by him as witness for plaintiff, which matters were also gone into by appellant and her son, in their testimony.

Appellant relies upon the rule of law that the keeping of an animal known to be vicious or likely to injure others, is, of itself, such negligence as will render the keeper liable in damages, for injuries done by such animal, as in the case of *Ahlstrand v. Bishop,* 88 Ill. App. 424. Appellee relies upon the rule that a landlord is not liable to a tenant for injuries caused by an ugly or vicious animal where the tenant had full knowledge of such characteristics, as in the case of *Hosmer v. Carney,* 228 N. Y. 73, 126 N. E. 650 (1920). In support of this rule, appellee further refers to 3 C. J. S. p. 1098, sec. 13a; 6 Am. Jur. p. 290, sec. 197. In this regard it is held in *Talmage v. Mills,* 80 N. Y. Supp. 637 (1903), that before a tenant on shares can recover for injuries inflicted by a vicious bull, left on the farm by the owner, he must show that such owner had knowledge of the animal's viciousness and failed to disclose same to the tenant. The general doctrine appears to be that if the plaintiff knew of the ugly and vicious character of the bull, he is deemed to have assumed the risks incidental to its custody and may not recover. *Donohue v. Frank E. Scott Transfer Co.,* 141 Ill. App.

174, 176, 177; *St. Louis National Stockyards v. Morris,* 116 Ill. App. 107, 109; *Althardt v. Consolidated Coal Co.,* 165 Ill. App. 504, 506, 507.

Appellant seeks to avoid the above rule by the case of *Lettis v. Horning,* 22 N. Y. Supp. 565 (1893). In that case, however, when the bull became ugly and vicious, and the defendant was notified of the fact, "he refused to consent to have the animal shut up, day or night." He further refused to allow a ring to be placed in the bull's nose, to which a rope or chain could be attached. The court found that he declined to consent for the plaintiff to take proper measures to prevent the bull from doing injury. The court found further that the plaintiff endeavored to induce the defendant to consent that he might take proper measures with the bull to prevent it from doing him injury, to which defendant refused. In the case at bar, the plaintiff's evidence shows the deceased took whatever measures and precautions to insure his safety in handling this bull, that he desired. He had a ring in its nose with a rope attached thereto. The bull was continuously kept in the barn in a stanchion where he was confined and tied except when released for service, and the deceased handled the bull with a pitchfork. Thus plaintiff's evidence clearly establishes the fact that the deceased was fully aware of the bad temper and vicious characteristics of the animal, and that he took such measures as he chose to guard against injury. There is no evidence that appellee or his farm manager Brown ever gave any directions or orders to deceased as to how he should keep or handle the bull, except Brown's suggestion to deceased that he keep him locked up and watch him carefully. Brown's first knowledge of the bull's viciousness was received from the deceased and his family. On the morning in question, when the deceased released the bull from his stanchion in the barn and turned him out in the cow yard for service, he was acting wholly upon his own volition. He knew the characteristics of this animal, and so long as he was

facing the bull with a pitchfork, he was successful in handling it without injury. It was when he turned to close the barn door that the bull struck him.

Under the facts in the case and law applicable thereto, no liability rests upon the appellee. The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*